**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **IN RE: SNOWFLAKE, INC., DATA SECURITY BREACH LITIGATION** | **MDL No. 3126** |

**PLAINTIFFS RICHARD OLIVIERI AND LAUREN WOON'S RESPONSE IN
OPPOSITION TO PLAINTIFF EMMANUEL CHAIDEZ'S MOTION FOR TRANSFER
AND CENTRALIZATION OF RELATED ACTIONS TO THE
DISTRICT OF MONTANA PURSUANT TO 28 U.S.C. § 1407
FOR CONSOLIDATED PRETRIAL PROCEEDINGS**

## I.     INTRODUCTION

Plaintiffs Olivieri and Woon oppose the motion filed by Plaintiff-Movant Emmanuel Chaidez ("Movant") seeking to transfer seven separate collections of data breach actions including: (i) Ticketmaster Data Breach Cases (18 nearly consolidated actions proceeding in Los Angeles); (ii) Advance Auto Parts Data Breach actions (12 fully consolidated actions in Raleigh); (iii) AT&T Data Breach Actions (14 not-yet consolidated AT&T actions in Atlanta); (iv) Neiman Marcus Group, LLC, LendingTree, LLC, and Cricket Wireless Data Breach Actions (each having only single cases filed to date); (v) Snowflake Data Breach actions (a total of 13 actions); and (vi) any tag-along actions or other cases that might be subsequently filed in any of the separate data breach actions or possible additional  actions against new corporate entities.

The J.P.M.L. panel has repeatedly emphasized that centralization under Section 1407 "should be **the last solution after considered review of all other options."** This concept is especially important here, where centralization would cause major inconveniences to numerous parties and witnesses, including the witnesses of *each separate* Corporate Defendant. Importantly, the majority of the actions against Corporate Defendants do not name Snowflake at all – like plaintiff Chaidez's case.

Critically, Movant overlooks the parties' effective voluntary efforts thus far to consolidate the separate data breach actions against each Corporate Defendant. The related cases against Advance Auto Parts (including Plaintiff Chaidez's action) *have* already been consolidated and are proceeding in the District of North Carolina. Plaintiffs in Ticketmaster, likewise, have moved for *unopposed* consolidation of the Ticketmaster actions in the Central District of California. Three single cases - one case against Neiman Marcus (S.D. Fl.), LendingTree (D. Mont.), and Cricket Wireless (N.D. Ga.) do not require consolidation. Parties in the AT&T cases are working through whether the cases should proceed in Georgia (where AT&T Mobility is headquartered) or Texas (where AT&T Inc. is headquartered, and another MDL against AT&T is pending). Snowflake has itself filed a motion for consolidation of Snowflake cases in Montana and severance of Corporate Defendants from actions that name it.

No reason or need exists to interfere with the in-progress, preferable, and effective coordination presently underway, to instead move all the consolidated, or about to be consolidated, actions into another jurisdiction, causing inconveniences to each of the Corporate Defendants, witnesses, parties, and victims of the data breaches. This is a circumstance where each of the separately consolidated actions against Corporate Defendants, and Snowflake actions can proceed separately. The cases against each Corporate Defendant require a review of *their* policies and procedures (including MFA), their relationships with their own customers or employees, and their decisions to store different confidential files on the Snowflake cloud, among others. Ruling on these questions in a case against one Corporate Defendant will have no effect on another Corporate Defendant. For instance, whether AT&T's promises of security to its customers forms a basis for implied breach of contract action will have no effect on whether promises and representations unique to Ticketmaster give rise to the same cause of action. Indeed, discovery on these issues will likely involve sensitive business information that Corporate Defendants will not want shared with unrelated Corporate Defendants.

Thus, consolidation of all seven sets of data breach actions against separate Corporate Defendants into one action is inappropriate pursuant to 28 U.S.C. § 1407, because (1) litigating

Snowflake-only actions as a single stand-alone consolidated action is more efficient; (2) the parties are informally coordinating within each separate data breach, consolidating their actions; and (3) the separate data breach actions involve unique and distinguishable facts and law for which a single court would not be helpful nor necessary.

## II.     BACKGROUND

### A.     The Snowflake Data Theft Attack

Snowflake is a leading cloud-based data storage and analytics provider.[1] It provides digital warehouses, known as "Snowflake Data Clouds" to corporate clients around the world.[2] Snowflake has over 9,000 clients including AT&T, Ticketmaster, Advance Auto Parts, LendingTree, Cricket Wireless, and Neiman Marcus.[3] Snowflake provides services to clients "under an agreement [] and solely for their benefit."[4] According to Snowflake, its customers are responsible for their data.[5]

In June 2024, Snowflake announced a data security incident that affected as many as 165 of its clients (the "Snowflake Data Breach").[6] In mid-April 2024, an unauthorized party gained access to Snowflake's data cloud. The hackers stole customer and employee data from the seven Corporate Defendants, and other entities.[7] Mandiant, a cybersecurity firm that assisted Snowflake in its incident response, tracked the unidentified threat actor under the name UNC5537, describing

---

[1] *Cloud Partners*, SNOWFLAKE, https://www.snowflake.com/en/why-snowflake/partners/cloud-partners/ (last visited August 16, 2024).

[2] *What is the Data Cloud?*, SNOWFLAKE, https://www.snowflake.com/trending/what-data-cloud/ (last visited August 16, 2024).

[3] *Leaders Choose Snowflake*, SNOWFLAKE, https://www.snowflake.com/en/customers/all-customers/ (last visited August 16, 2024).

[4] *Snowflake Privacy Notice*, SNOWFLAKE (August 1, 2024) https://www.snowflake.com/privacy-policy/ (last visited August 16, 2024).

[5] *Ibid*.

[6] Brad Jones, *Detecting and Preventing Unauthorized User Access*, SNOWFLAKE (May 30, 2024; latest update: June 10, 2024) https://snowflake.discourse.group/t/detecting-and-preventing-unauthorized-user-access/8967/1 (last visited August 16, 2024).

[7] Matt Burgess, *The Snowflake Attack May Be Turning One of the Largest Data Breaches Ever,* WIRED (June 6, 2024 3:41 PM) https://www.wired.com/story/snowflake-breach-advanced-auto-parts-lendingtree/ (last visited August 16, 2024).

it as financially motivated.[8] Mandiant explained, since April 2024 "UNC5537 [] [was] systematically compromising Snowflake customer instances using stolen customer credentials, advertising victim data for sale on cybercrime forums, and attempting to extort many of the victims."[9] Mandiant's investigation revealed that the threat was successful because "the impacted accounts were not configured with multi-factor authentication [MFA] enabled, meaning successful authentication only required a valid username and password."[10]

Snowflake blames the data theft on its clients (Corporate Defendants) who did not require MFA to secure customer and employee data hosted on their Snowflake accounts.[11] At the same time, as a matter of practice, Snowflake did not enable, enforce, or require its clients to use MFA. Shortly after its own security incident, Snowflake implemented significant changes to its MFA practices that should have been in place all along given industry standard, including giving administrators of Corporate Defendants the option to make MFA mandatory, adding more security customization options, and introducing a new platform for monitoring and enforcing MFA.[12]

### B.    The Corporate Defendants – Snowflake Customer's Varying Data Breaches

#### 1.    Ticketmaster/Live Nation Data Breach

On July 8, 2024, Ticketmaster, a wholly owned subsidiary of Live Nation Entertainment, Inc., began notifying over 500 million former and current customers of a data security incident (the "Ticketmaster Data Breach").[13] Ticketmaster is a ticket distribution company that buys, sells,

---

[8] *UNC5537 Targets Snowflake Customer Instances for Data Theft and Extortion*, GOOGLE CLOUD (June 11, 2024) https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion (last visited August 16, 2024).

[9] *Ibid*.

[10] *Ibid*.

[11] *Ibid*.

[12] Sead Fadilpašić, *Snowflake is Bringing in Some Big MFA Changes Following Recent Security Incidents*, TECHRADAR (July 11, 2024) https://www.techradar.com/pro/security/snowflake-is-bringing-in-some-big-mfa-changes-following-recent-security-incidents (last visited August 16, 2024).

[13] *Data Breach Notifications*, OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/0d26b6dd-b466-4f2a-bec0-ec2ad0738583.html (last visited August 18, 2024).

and transfers tickets for large-scale sports and entertainment, focusing on sales, marketing, and distribution. [14]

Ticketmaster disclosed only scant details of the breach, including that an unauthorized third party obtained customer data from a cloud database hosted by Ticketmaster's third-party service provider, Snowflake.[15] The breach occurred between April 2, 2024 and May 18, 2024 and stolen data included full names, addresses, email addresses, phone numbers, ticket sales and event details, order information, the last four digits of card numbers, expiration dates, and customer fraud details.[16] On May 28, 2024, the hacking group, ShinyHunters, posted that 1.3 terabytes of Ticketmaster's customer data was available for purchase on the dark web for $500,000. [17]

The first action filed against Ticketmaster relating to this breach, *Ryan, et al. v. Ticketmaster, et al.*, 2:24-cv-04482-SPG-JC, was filed in the Central District of California ("C.D.C.A.") on May 29, 2024, where Ticketmaster and Live Nation are headquartered. [18] Since then, twenty more cases have been filed, only two of which name Snowflake. *See Rason v. Snowflake Inc. and Ticketmaster LLC,* (CV-24-76-BU-BMM, D. Mont.) and *Yarbough, et al. v. Snowflake, Inc., Live Nation Entertainment, Inc. and Ticketmaster LLC* (2:24-cv-06604, C.D.C.A.). Multiple plaintiffs have moved for unopposed consolidation of the related Ticketmaster actions in the C.D.C.A. The parties in the Ticketmaster actions only dispute the structure of leadership, an issue that is already fully submitted and pending before the Hon. Judge Garnett. The

---

[14] *Ticketmaster LLC company profile*, BLOOMBERG, https://www.bloomberg.com/profile/company/0009574D:US; *Ticketmaster*, LIVE NATION, https://www.livenation.com/ticketmaster/ (last visited August 16, 2024).

[15] Ravie Lakshmanan, *Lessons from the Snowflake Breaches*, THE HACKER NEWS (June 12, 2024) https://thehackernews.com/2024/06/lessons-from-ticketmaster-snowflake.html (last visited August 16, 2024).

[16] Waqas, *Ticketmaster Data Breach: Hackers Selling 560 Million Users Data for $500,000*, HACK READ (May 28, 2024) https://hackread.com/hackers-ticketmaster-data-breach-560m-users-sale/ (last visited August 16, 2024).

[17] *Ibid*.

[18] James Powel and Saleen Martin, *Ticketmaster confirms data breach, won't say how many North American customers*, USA TODAY, compromisedhttps://www.usatoday.com/story/money/2024/07/01/ticketmaster-data-breach-2024/74276072007/ (last visited August 18, 2024).

only actions pending outside of the district, *Doe v. Ticketmaster LLC, Live Nation Worldwide, Inc.* (5:24-cv-00980, N.D. Al.) and *Rason* (D. Mont.), can be transferred to the C.D.C.A.[19]

## 2. Advance Auto Parts Data Breach

Advance Auto Parts is a retailer of aftermarket parts that, as of April 20, 2024, operates 4,777 stores primarily in the United States.[20] Early last month, Advance Auto Parts began notifying over 2.3 million current, former, and prospective employees of a data breach.[21] According to Advance Auto Parts, an unauthorized third party accessed or copied certain employment information maintained by Advance Auto Parts and stored within Snowflake, its cloud storage and data warehousing vendor (the "Advance Auto Parts Data Breach").[22] Data breached includes PII of consumers, and current, former and prospective employee names, SSNs, and driver's license or other government issued identification numbers.[23] A threat actor with the moniker "Sp1d3r" posted to a cybercrime forum, claiming to have 3TB of this data to sell.[24]

Twelve cases against Advance Auto Parts have been filed in the E.D.N.C. None of them – including Movant's action – name Snowflake. The cases against Advance Auto Parts, including Movant Chaidiz's case, have already been consolidated into a single action, *In re Advance Stores Company, Incorporated, Data Breach Litigation,* 5:24-CV-00352-M, in the Eastern District of North Carolina on July 23, 2024, six days prior to Chaidiz's filed MDL petition in this matter. Only two actions that also named Snowflake are outside of North Carolina: *Bobbitt v. Snowflake*

---

[19] *Dickey-Johnson* (E.D. Pa.) is being transferred to the C.D.C.A. *See Dickey-Johnson v. Ticketmaster et al,* 2:2024-cv-02623, ECF 10.

[20] *Corporate Profile*, ADVANCE AUTO PARTS, https://ir.advanceautoparts.com/investors/overview/ (last visited August 16, 2024).

[21] Bill Toulas, *Advance Auto Parts data breach impacts 2.3 million people*, BLEEPING COMPUTER (July 11, 2024 10:17 AM) https://www.bleepingcomputer.com/news/security/advance-auto-parts-data-breach-impacts-23-million-people/ (last visited August 16, 2024).

[22] *Advance Auto Parts Consumer Notice,* DOCUMENT CLOUD, https://www.documentcloud.org/documents/24799288-advance_auto_parts (last visited August 16, 2024).

[23] *Ibid*.

[24] Phil Muncaster, *Snowflake Breach at Advance Auto Parts Hits 2.3 Million People,* INFOSECURITY MAGAZINE (July 12, 2024) https://www.infosecurity-magazine.com/news/advance-auto-parts-snowflake/ (last visited August 16, 2024).

and *Advance Stores Company, Inc.* (2:2024cv00071, D. Mont.) and *Townsend v. Snowflake, Inc.* (2: :2024cv00077, D. Mont.).

### 3.    AT&T Data Breach

Last month, AT&T announced that data of "nearly all" its 110 million cellular customers was illegally downloaded in April 2024, from its workspace hosted on Snowflake's cloud platform in a massive security breach (the "AT&T Data Breach").[25] This breach affects former and current AT&T customers, as well as non-customers (subscribers of other wireless carriers).[26]

AT&T claims stolen data did not contain "the content of calls or texts" but did include calling and texting records that an AT&T phone number interacted with between May 1, 2022 and October 31, 2022 — such as who contacted who by phone or text as well as the total count of a customer's calls and texts and call durations – aka metadata.[27] Stolen data also included one or more cell site ID numbers associated with phone calls and text messages from January 2, 2023.[28] Data from customers of AT&T's mobile virtual network operators ("MVNO") such as Boost Mobile, Cricket Wireless, H2O, and Straight Talk Wireless were also stolen.[29]

Fourteen related actions have been filed against AT&T; *Oliveri* has been amended to remove AT&T. Of these, nine cases named Snowflake and were filed in the D. Montana. Six of the pending actions were filed in the N.D. Tex., where AT&T, Inc.'s principal place of business is located.[30] AT&T Mobility LLC is a wholly owned subsidiary of AT&T, Inc. with its principal

---

[25] *Unlawful access of customer data,* AT&T, Last updated: July 24, 2024, https://www.att.com/support/article/my-account/000102979?source=EPcc000000000000U (lasted visited August 16,2024).

[26] *See Hale v. AT&T, Inc* (3:24-cv-1943, N.D. Tex.); *Ghanaat v. AT&T, Inc.* (3:24-cv-05065-TSH, N.D.C.A.).

[27] *Ibid*.

[28] *Ibid*.

[29] Lauren Hannula, *AT&T MVNOs: Carriers that use AT&T's network,* WHISTLE OUT (February 02, 2024) https://www.whistleout.com/CellPhones/Guides/att-mvnos (last visited August 16, 2024).

[30] *How can we help you?*, AT&T, https://investors.att.com/resources/contacts (last visited August 18, 2024).

place of business in Atlanta Georgia.[31] The actions against AT&T entities are subject to a separate MDL (No. 3124), where plaintiff Lori Young (*Lori Young v. AT&T Mobility, LLC,* No. 1:24-cv-03185) moved to transfer all AT&T cases to the N.D. Ga. On August 20, 2024, Movant Young filed a motion to withdraw her motion to transfer (MDL No. 3124, ECF 33) on grounds it is subsumed by the current Motion filed by Chaidez. That same day the J.P.M.L. denied Young's motion to withdraw finding "[t]he question of centralization remains a live controversy given the [six] responses filed to date" at least two of which support the proposed MDL and confirmed that the motion for centralization filed in MDL No. 3124 "will be considered together with the motion for centralization in MDL No. 3126" at the Panel hearing on September 26, 2024. *Id.* at ECF 34.

### 4.     Separate MDL Proceeding – Snowflake

A total of thirteen actions have been filed against Snowflake, including *Olivieri*. Eleven of these actions have been filed in D. Montana, where Snowflake maintains an office address for the purposes of its SEC filings.[32] Two actions have been filed in the Northern District of California ("N.D.C.A."), where the majority of Snowflake's workforce and several key executives responsible for Snowflake's cybersecurity and data privacy policies are located. Snowflake's role as the host of the cloud servers can be succinctly paired down to its failure to provide an MFA enforcement mechanism for database administrators; whereas each individual Corporate Defendant was aware of this MFA vulnerability and thus may be separately responsible for failure to take actions.[33]

### 5.     Single Action Cases Against Neiman Marcus, Lending Tree, and Cricket Wireless

At the end of June 2024, Neiman Marcus announced a data breach that occurred a couple

---

[31] *AT&T Mobility*, PITCH BOOK, https://pitchbook.com/profiles/company/41510-71 (last visited August 18, 2024).

[32] *Form 8-K Snowflake Inc.,* SEC ARCHIVES, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001640147/000164014721000103/snow-20210526.htm (noting in footnote 1 that Snowflake's designation of the Montana office is made solely for the purposes of the SEC report, where only two of its executives are based).

[33] *FAQ: Multi-Factored Authentication (MFA),* SNOWFLAKE, (August 5, 2023) https://community.snowflake.com/s/article/MFA-FAQs (last visited August 16, 2024).

months prior, impacting personal information from its Snowflake consumer database, including names, contact information (email and postal addresses, phone numbers), dates of birth, gift card information (not PINs), transaction data, partial credit card numbers, last four digits of SSNs, and employee identification numbers (the "Neiman Marcus Data Breach").[34] Only one action has been filed against Neiman Marcus, *Reichbart v. Neiman Marcus Group, LLC,* 0:2024-cv-61389, in the Southern District of Florida. Neiman Marcus is headquartered in Dallas, Texas, and incorporated in the state of Delaware.[35]

LendingTree confirmed on June 10, 2024, a security incident involving QuoteWizard, one of its subsidiaries, which hosts an insurance information platform on Snowflake (the "LendingTree Data Breach").[36] Last month, LendingTree notified impacted QuoteWizard customers about the stolen data (customer names, residential addresses, and driver's license numbers.)[37] To date only one case has been filed against LendingTree, *Nader v. Snowflake, Inc. and LendingTree LLC* (CV-24-79-BU-BMM, D. Mont). LendingTree is an LLC registered in Delaware and headquartered with its principal place of business in Charlotte, North Carolina.[38]

On July 22, 2024, Cricket Wireless confirmed a data breach affecting millions of its customers (the "Cricket Wireless Data Breach").[39] The data involved in this incident included

---

[34] Darcy Penick*, Information for Customers about Data Security Issue,* NEIMAN MARCUS BERGDORF GOODMAN, https://www.neimanmarcusgroup.com/nmg-data-security (last visited August 18, 2024).

[35] *Form S-3 Registration Statement Advance Auto Parts,* SEC ARCHIVES (April 26, 2010) https://www.sec.gov/Archives/edgar/data/1061890/000119312510092668/ds3asr.htm (last visited August 16, 2024).

[36] Katie Jensen, *Hackers Auction Off LendingTree Consumers' Data,* NATIONAL MORTGAGE PROFESSIONAL (June 26, 2024) https://nationalmortgageprofessional.com/news/hackers-auction-lendingtree-consumers-data (last visited August 18, 2024).

[37] Heather Enlow-Novitsky, *Notice of Data Incident Affecting Iowa Residents,* IOWA ATTORNEY GENERAL (July 31, 2024). https://www.iowaattorneygeneral.gov/media/cms/7312024_QuoteWizard_6FE9E5A5CEA7A.pdf (last visited August 18, 2024).

[38] *Business Registration online search,* SECRETARY OF STATE ELAINE F. MARSHALL, https://www.sosnc.gov/online_services/search/Business_Registration_Results (last visited August 18, 2024).

[39] Jessy Edwards, *Cricket Wireless Class Action Claims Data Breach Affects 10M Customers,*

records of text messages and calls from Cricket subscribers from May 1, 2022 to October 31, 2022, and from January 2, 2023.[40] To date, only one case has been filed against Cricket Wireless, *Morgan v. Cricket Wireless, LLC*  (1:24-cv-03253-ELR, N.D. Ga.). Cricket Wireless, LLC is registered in Delaware, and headquartered in Atlanta, Georgia.[41]

## III.   LEGAL STANDARD

Under 28 U.S.C § 1407, granting a motion to consolidate proceedings is only appropriate if (1) the actions share common issues of fact, (2) transfer would be in further convenience of parties and witnesses, and (3) transfer would advance the just and efficient conduct of the actions. With that in mind, the J.P.M.L. has "emphasized that centralization under Section 1407 **should be the last solution** after considered review of all other options." *In re Accellion, Inc. Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 1372, 1374 (J.P.M.L. 2021) (emphasis added) (denying centralization in a similar scenario, despite some overlap of factual and legal issues in actions); *see also In re Alteryx, Inc., Customer Data Sec. Breach Litig.*, 291 F. Supp. 3d 1377, 1378 (J.P.M.L. 2018) (same); *In re Best Buy Co.*, 804 F. Supp. 2d 1376 (J.P.M.L. 2011) (same).

Further, the party seeking consolidation bears "a strong burden to show that the common questions of fact are so complex and the accompanying common discovery so time-consuming as to overcome the inconvenience to the party whose action is being transferred and its witnesses." *In re Multidistrict Civil Antitrust Actions Involving The Distribution of Scotch Whiskey*, 299 F. Supp. 543, 544 (J.P.M.L. 1969). Movant Chaidez, whose case has already been consolidated with other Advance Auto Parts actions, has not met this burden.

## IV.   ARGUMENT

Movant's request to centralize and disturb the parties' nearly consolidated separate actions

---

TOP CLASS ACTIONS (August 6, 2024) https://topclassactions.com/lawsuit-settlements/privacy/data-breach/cricket-wireless-class-action-claims-data-breach-affects-10m-customers/ (last visited August 20, 2024).

[40] *Ibid.*

[41] *Cricket Wireless Corporate Address,* CRICKET WIRELESS, https://www.cricketwireless.com/legal-info/corporate-address.html (last visited August 20, 2024).

fails under 28 U.S.C. § 1407, because (1) litigating the primary and non-complex issue involving Snowflake in a stand-alone action is more efficient and will not interfere, or substantially overlap, with the individual litigation of the Corporate Defendants' consumer facing cases which each raise many separate issues of law and fact; (2) the parties are effectively self-organizing, already participating in formal and informal coordination within each separate data breach, which is favored over a "last solution" J.P.M.L. centralization; (3) the separate data breach actions involving Ticketmaster entities, AT&T, Advanced Auto Parts, LendingTree, Cricket Wireless, and Neiman Marcus overwhelmingly involve separate and distinguishable facts and law, irrelevant to Snowflake, including types of data, data practices, and duties to their customers and thus would delay potential resolution and adjudication of stand-alone Snowflake litigation; and (4) even if future actions were filed against additional Corporate Defendants, they could likewise proceed separately and transfer of those cases would delay resolution and/or disrupt litigation of all actions currently underway.

> A.    **The Panel Should Deny Plaintiff Chaidez's Motion to Transfer To Avoid Interfering With A Streamlined Snowflake Litigation, Imposing Significant Burden on Witnesses and Parties in Separate Actions, Delaying Proceedings of All Actions**

> 1.    **Snowflake Should be Litigated as a Standalone Case in D. Montana**

Snowflake's role as the host of the cloud servers, can be succinctly paired down to its failure to provide an MFA enforcement mechanism for database administrators. Using Snowflake as a cloud storage vendor, each individual Defendant **was aware of this MFA vulnerability**.[42] With this knowledge, the Corporate Defendants' subsequent decisions not to provide adequate data security protocols and store highly confidential information affecting their current/former customers, current/former employees, or other third parties, form the factual basis for the individual cases.[43] Each separate case has a complex network of data, data practices, duties, and

---

[42] *FAQ: Multi-Factored Authentication (MFA),* SNOWFLAKE (August 5, 2023) https://community.snowflake.com/s/article/MFA-FAQs (last visited August 16, 2024).
[43] Shane Snider, *Snowflake's Lack of MFA Control Leaves Companies Vulnerable, Experts Say,* INFORMATION WEEK (June 5, 2024) https://www.informationweek.com/cyber-

relationships, which are specific to the individual Corporate Defendants' consumer facing business. Further, each case will have mutually exclusive questions concerning the Corporate Defendants' decisions to store their private consumer information on the Snowflake cloud.

*In re Accellion* is instructive here and compels the denial of transfer and consolidation. Accellion was a vendor who experienced a breach that affected specific "client defendants" (much like the Corporate Defendants here). *See In re Accellion*, 543 F. Supp. 3d at 1373. One plaintiff sought to transfer and consolidate all client defendants' cases under the umbrella of the *Accellion* litigation. *Id.* The Panel denied the motion, finding each client defendant's data breach was more akin to an individual breach rather than one single breach from the Accellion servers. *Id*. at 1374. The Panel therefore held there would be too little overlap of fact and law to warrant consolidation, and any issue that may involve Accellion in each client defendant's case could more easily be remediated by informal coordination as favored under the law. *Id.* The same is true here. Because there is little factual overlap relevant to both Snowflake and the Corporate Defendants, efficiency would be better served with Snowflake as a standalone case. *Id.* (any factual overlap as to Accellion's involvement "may be eclipsed by factual issues specific to each client defendant"). Consolidation of all Corporate Defendants' cases would likely cause undue delay, inefficiency, as well as a burden on the court and all affected parties.

Additionally, the circumstances leading to the Snowflake Data Breach and the extent of Snowflake's liability do not need to be litigated in any of the other Corporate Defendants cases for which Movant Chaidez seeks consolidation. Snowflake's own terms of service dictate that its customers indemnify Snowflake for any third-party liability arising from or relating to any client data.[44] Therefore, possibility of cross-claims against Snowflake in the separate data breach actions against Corporate Defendants is unlikely. Snowflake also blames the data theft on the individual

---

resilience/snowflake-s-lack-of-mfa-control-leaves-companies-vulnerable-experts-say#close-modal (last visited August 16, 2024).

[44] *Terms of Service,* SNOWFLAKE, https://www.snowflake.com/legal/terms-of-service/ (last visited August 19, 2024).

Corporate Defendants' failure to require MFA to secure data hosted on their Snowflake accounts.[45] Thus Snowflake and each Corporate Defendants' liability is distinct and will involve unique claims, damages, and evidence. Because Snowflake is not named as a defendant in most of the Corporate Defendants' cases Chaidez seeks to join, Snowflake's liability will not be litigated in those cases. Like *In re Accellion*, the limited number of overall cases naming Snowflake as a defendant weighs against consolidation. *Id.*, 543 F. Supp. 3d at 1373 (the Panel finding the number of total actions naming Accellion, nine out of twenty-six, were too few for consolidation). For this reason, the actions do not share common issues of fact, therefore transfer and consolidation are not satisfied under 28 U.S.C. § 1407(a).

Given the limited nature of Snowflake's involvement in the Corporate Defendants' cases, and the opposition of Snowflake to the consolidation of all separate cases against all their corporate clients, the Panel should deny consolidation and allow the Snowflake litigation to move forward unencumbered by the complexity and intricacies of the individual Corporate Defendants' cases. Keeping the Corporate Defendants' cases separated from Snowflake will allow for a quick, efficient resolution of the Snowflake actions and uninterrupted litigation of the cases involving corporate entities. *See In re Accellion,* 543 F. Supp. 3d at 1373-1374 ("We see no reason to disrupt the parties' efforts at informal coordination when most agree that Section 1407 centralization would provide little or no benefit."); *see also In re Alteryx,* 291 F. Supp. 3d at 1378 ("Despite the overlap in factual and legal issues among these cases, we find that Section 1407 centralization is not necessary."); *In re Best Buy*, 804 F. Supp. at 1376 ("these [] cases could proceed just as efficiently without centralization").

If the straightforward Snowflake-only actions are instead consolidated with each of the separate Corporate Defendants' Data Breaches, more efficient resolution is unlikely. *See In Re: MOVEit Customer Data Security Breach Litigation,* 1:23-md-3083 (D. Mass) (after nearly a year

---

[45] Phil Muncaster, *Snowflake Breach at Advance Auto Parts Hits 2.3 Million People,* INFOSECURITY MAGAZINE (July 12, 2024) https://www.infosecurity-magazine.com/news/advance-auto-parts-snowflake/ (last visited August 16, 2024).

of consolidating cases, defendants' motion to dismiss for article III standing has not yet been briefed; motions to compel arbitrations are yet to be heard). Thus, consolidating Snowflake-only cases with the separate data breaches would deny justice and quick and efficient resolution for millions of the affected victims.

### 2.   The Parties are Informally Coordinating in the Separate Actions

While the number of related actions in each Corporate Defendant's case has grown, they are now in a steady state where the parties have been working to informally coordinate and self-organize in efforts to transfer and consolidate cases to the appropriate Districts for the convenience of the courts, parties, and witnesses. This coordination counsels against Movant's position. *See In re Accellion,* 543 F. Supp. 3d at 1373 (holding that consolidation is unnecessary where "most parties . . .  have cooperated to organize all but two actions into three coordinated or consolidated proceedings"). Twelve cases against Advanced Auto Parts have already been consolidated in the Eastern District of North Carolina. As discussed *supra*, plaintiffs in the Ticketmaster actions moved to consolidate in the C.D.C.A., with no opposition. Snowflake and several plaintiffs in Snowflake-only actions are making efforts to consolidate informally in Montana. The final placement of the AT&T related actions is at the heart of a parallel MDL. And with only three single cases filed against Neiman Marcus, LendingTree, and Cricket Wireless there is little concern regarding informal coordination. By informally coordinating, the Corporate Defendants' cases may be held in jurisdictions appropriate for each Corporate Defendant, providing the most convenient forum for the parties and key witnesses in each case, thus promoting the just and efficient conduct required by Section 1407(a).

### 3.   The Separate Actions Against Corporate Defendants Involve Unique and Distinct Questions of Law and Fact, Unrelated to All Other Actions

As detailed above, each Corporate Defendant's case involves specific and distinct issues of fact and law, none of which will be relevant in the Snowflake litigation or litigation against each separate Corporate Defendant. Because the Corporate Defendants' cases will have a significant amount of case specific discovery, transfer and consolidation of all related matters "would provide

little or no benefit." *See In re Accellion,* 543 F. Supp. 3d at 1374; *In re Family Dollar Stores, Inc.*, 466 F. Supp. 3d 1383, 1384 (J.P.M.L. 2020) (consolidation improper where "[a]significant amount of discovery appears almost certain to be case-specific — i.e., directed to conditions in the Family Dollar stores in the state or 'operational area' unique to each action.").

The facts which differ for each Corporate Defendant's case include: the (1) nature of *their* separate relationships with their customers; (2) the different types of data each Corporate Defendant has elected to store on Snowflake clouds; (3) each Corporate Defendant's data security policies, duties, and liabilities, including any specific measures taken to guard against the MFA vulnerability; (4) timeline and adequacy of notices to customers of their data breach, and the adequacy of any remedial measures offered to affected victims; and (5) potential applicability, or navigation of, separate arbitration clauses. Due to these differences, MDL consolidation would result in undue delay and a burden on the parties including the victims' right to swift and orderly relief.

### a)    The Nature of the Relationships

The nature of the relationship that each Corporate Defendant has with their customers varies depending on their type of business. AT&T, a telecom company, whose inadequate practices affected both *its* cellular and landline customers and *non-customers* (for example Cricket and other wireless subscribers) who communicated directly with an AT&T customer. *See* Section II(B)(3) *supra*. Ticketmaster, an online event ticket platform, exclusively services customers who buy and sell tickets on their website or app. Neiman Marcus, a national department store retailer, serves customers through its website, mobile applications, and in-store visits. LendingTree is a financial services vendor whose customers are engaged in long-term lending relationships. The Cricket Wireless breach affected millions of its cellular only customers. Finally, even though Advanced Auto Parts is a retailer, the affected victims of the data breach uniquely involve current, former, and prospective employees. These six Corporate Defendants cover the business sectors of advertising, entertainment, and media; telecom; employment; technology; financial services; and retail and consumer goods. Because only six of Snowflake's roster of 165 businesses are currently

engaged in suit, there could be dozens more individual Corporate Defendant suits filed in industries such as healthcare; life sciences; manufacturing and industrial; and the public sector. All potential Corporate Defendants would have vastly different types of relationships with their customers, and as here, a wide range of differing facts forming the basis for each potential case.[46]

**b)**      **Types of Data**

Just as the nature of the relationships in the Corporate Defendants' cases vary, so does the type of data which was breached. In the AT&T case, the data at issue includes phone numbers of nearly all its customers; as well as logs of texts and phone calls between AT&T customers and customers of other wireless networks, showing how often they interacted and the duration of the phone calls.[47] Cricket Wireless experienced a breach of logs containing phone numbers, records of text messages and calls, and cell site identification numbers.[48] The Ticketmaster breach included full names, addresses, email addresses, phone numbers, ticket sales and event details, order information, and credit card information.[49] In Neiman Marcus, the data included customer names, emails, addresses, phone numbers, dates of birth, last four digits of Social Security numbers, credit card numbers, transaction data, and employee identification numbers.[50] From LendingTree's QuoteWizard database, the stolen data included customer names, residential addresses, and driver's license numbers. [51] The data stolen in Advanced Auto Parts is different still, it was

---

[46] *Leaders Choose Snowflake,* SNOWFLAKE, https://www.snowflake.com/en/customers/all-customers/ (last visited August 16, 2024).

[47] *Unlawful Access of Customer Data,* AT&T (July 24, 2024) https://www.att.com/support/article/my-account/000102979?source=EPcc000000000000U (last visited August 16, 2024).

[48] [48] Jessy Edwards, *Cricket Wireless Class Action Claims Data Breach Affects 10M Customers,* TOP CLASS ACTIONS (August 6, 2024) https://topclassactions.com/lawsuit-settlements/privacy/data-breach/cricket-wireless-class-action-claims-data-breach-affects-10m-customers/ (last visited August 20, 2024).

[49] *Ticketmaster Data Security Incident,* TICKETMASTER, https://help.ticketmaster.com/hc/en-us/articles/26110487861137-Ticketmaster-Data-Security-Incident (last visited August 16, 2024).

[50] Segiu Gatlan, *Neiman Marcus Data Breach: 31 Million Email Addresses Found Exposed,* BLEEPING COMPUTER (July 8, 2024) https://www.bleepingcomputer.com/news/security/neiman-marcus-data-breach-31-million-email-addresses-found-exposed/ (last visited August 16, 2024).

[51] Heather Enlow-Novitsky, *Notice of Data Incident Affecting Iowa Residents,* IOWA ATTORNEY

16

information about its employees and the leaked data thus implicates personal information uniquely required for employment and employment applications.[52]

### c)    Data Practices, Duties, and Liability

As separate and distinct entities, the Corporate Defendants have their own data practices, based on specific state and federal statutes, and each entities' internal policies. For example, AT&T's policies are based on operating "one of the world's most advanced and powerful global backbone networks [which] is a recognized leading provider of IP-based communication services."[53] Ticketmaster, on the other hand, employs a system of ten "commitments" from their vision that "[f]ans' rights and choices are at the forefront of everything [they] do."[54] Because each Corporate Defendant has their own version of data policies and user guidelines, the facts related to these policies will be different in each case. The consequences of each Corporate Defendants' inaction will vary based on their individual policies, duties, and promises to their customers.

In addition to their in-house policies, the Corporate Defendants have varied statutory duties, and from those duties, liability to their customers. For example, the Advanced Auto Parts breach of an employee database has different ramifications than the Neiman Marcus breach governed by consumer protection statutes. With these differing statutory duties by industry, also comes differing duties by state, which may be determined by choice of law provisions within each Corporate Defendants' different policies. Consolidating all, or even two, of the Corporate Defendants' cases would thus unnecessarily complicate the otherwise separate and straight-forward actions, potentially delaying relief for millions for years longer than necessary.

---

GENERAL (July 31, 2024) https://www.iowaattorneygeneral.gov/media/cms/7312024_QuoteWizard_6FE9E5A5CEA7A.pdf (last visited August 18, 2024).

[52] *Data Breach Notification,* OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/9a6279ea-12a4-47c8-855e-9ce509f5a2b2.html (last visited August 16, 2024).

[53] *Network & Data Security*, AT&T, INC, https://sustainability.att.com/priority-topics/network-data- security (last visited August 18, 2024).

[54] *Our Commitments,* TICKETMASTER, https://privacy.ticketmaster.com/en/our-commitments (last visited August 16, 2024).

> d) **The Adequacy of Timeline and Notice; and Subsequent Remedial Measures**

Another factor different to each Corporate Defendant's case, is the date and process of notice to their customers. *See* Section II *supra.* These unique facts are also irrelevant to actions naming only Snowflake.

### 4.    Applicability of Arbitration Clauses

Finally, each Corporate Defendant named in the separate actions has their own terms with the affected victims of the data breach, including possible arbitration provisions, and none of those inquiries will overlap.

### 5.    Undue Delay and Burden on the Parties

Based on the complexity of each case and the differences in issues of fact and law specific to the Corporate Defendants, transfer and consolidation of all these cases into one MDL would be inefficient, inconvenient, and cause undue delay and burden on the parties and victims. Movant Chadiez argues that the motion herein should be treated as analogous to *In re Moveit Customer Data Sec. Breach Litig.*, MDL No. 3083, 2023 U.S. Dist. LEXIS 178596 (J.P.M.L. Oct. 4, 2023), but the cases are meaningly different. Many of the defendants in *Moveit* supported the mass consolidation, but that is lacking and unlikely here. *Id.* at *1. Further, unlike *Moveit,* here the parties have been informally coordinating to the point of already having orderly and consolidated actions for Advanced Auto Parts and Ticketmaster. *Id.* at *7-8.

Additionally, in *Moveit*, because of the clear and significant overlap of the facts and law in the related actions, the Panel could not conceive of a way to "disentangle" the multiple defendants' related actions from each other. Here, the opposite is true: most issues of fact and law do not overlap and the currently filed cases can proceed separately. The parties' successful efforts to consolidate separate actions thus show the ease and success of "disentangling" each action from the other, and how the lack of sufficiently overlapping fact and law would be a hinderance as compared to the separate actions proceeding separately. *Id.* at *6.

Finally, in deciding to consolidate cases in *Moveit*, the panel also considered that the majority of related actions had already been filed in the proposed District for transfer and

consolidation. *Id.* That is not the case here. While many of the *Snowflake actions* have been filed in Montana, most of the other actions have been filed in other districts, where each Corporate Defendant is headquartered.

Based on these facts, transfer and consolidation would cause an undue burden on the transferee court, as having a single Judge adjudicate such different and unrelated issues will overcomplicate what would otherwise be straightforward separate actions that can proceed independently. Any overlap in discovery may be efficiently achieved by the informal cooperation of counsel. *See In re Comcast Corp. Emple. Wage & Hour Empl. Practices Litig.,* 190 F. Supp. 3d 1344, 1345 (J.P.M.L. 2016) (consolidation should be denied where other options are available, including voluntary coordination among the parties).

**B.    If the Panel Is Inclined to Consolidate, the District of Montana would be an Appropriate Forum for the MDL, or Alternatively, the Northern District of California**

For the reasons set forth above, a massive consolidation of all data breach cases that tangentially relate to Snowflake is not appropriate. However, if the Panel disagrees and orders consolidation, then transfer of all the actions to Montana is appropriate. Judge Morris in Montana, before whom all the Montana cases are being consolidated, is a highly regarded jurist capable of managing this litigation if necessary.

Alternatively, if the Panel is not inclined to transfer consolidated actions to Montana, the Northern District of California is an equally appropriate venue, well suited to accommodate parties and witnesses across all separate data breach cases, and with significant judicial resources and expertise in data breach class actions. Snowflake has its largest office and executive presence in San Mateo, California.[55] In fact, many of Snowflake's executive team (its relevant witnesses and likely evidence) are located in the San Francisco Bay area of California, including Winston Su, its

---

[55]Stephen Council, *2 Years after pulling HQ from Bay Area, Snowflake reportedly eyes huge new office,* SF GATE (August 16, 2023) https://www.sfgate.com/tech/article/snowflake-new-office-real-estate-18299429.php (last visited August 16, 2024).

Sr. Director of Commercial and Technology Transactions;[56] and Waleed Ojeil, the VP of Engineering.[57] Snowflake also regularly holds its annual summit in San Francisco, accommodating thousands of its employees to be present in the Northen District of California. Located in "Silicon Valley," the Northern District of California is well versed in data breach cases, providing sufficient resources and expertise for the Snowflake related actions. With its large corporate presence in San Mateo, California, transfer to the Northern District of California would be centrally located for most of the parties in the Snowflake actions, and the Northern District of California could reasonably accommodate the logistical needs of an MDL. All three judges who are presently assigned to Snowflake-related actions pending in the Northern District of California (Hon. Charles R. Bryer, Hon. Salie Kim, or Hon. Thomas S. Hixson) are skilled and experienced jurists, and any one of them would be well equipped to handle a large MDL such as this one.

## V.   CONCLUSION

For the reasons set forth herein, Olivieri and Woon Plaintiffs respectfully request that the Panel deny Chaidez's motion to transfer and consolidate all related actions. The actions against each Corporate Defendant should be allowed to complete the self-consolidation they have already undertaken. The actions against Snowflake alone should be allowed to self-consolidate in Montana. If the Panel chooses to consolidate all actions, Montana would be an appropriate forum, or alternatively the Northern District of California, where Snowflake has the largest presence of contacts and employees.

Respectfully submitted,

Dated: August 21, 2024

BLOOD HURST & O'REARDON, LLP

By:      *s/ Timothy G. Blood*
TIMOTHY G. BLOOD

501 West Broadway, Suite 1490
San Diego, CA  92101

---

[56] Winston Su, *Winston Su Profile,* LINKEDIN, https://www.linkedin.com/in/winstonysu/ (last visited August 18, 2024).
[57] Waleed Ojeil, *Waleed Ojeil Profile,* LINKEDIN, https://www.linkedin.com/in/waleed-ojeil-25932ba1/ (last visited August 18, 2024).

Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
jmacpherson@bholaw.com

Counsel for Plaintiffs *Richard Olivieri and Lauren Woon*

*Olivieri, et al. v. Snowflake, Inc.*
No. 2:24-cv-00056 (Dist. Montana)