**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **In re Snowflake Data Breach Litigation** | **MDL No. 3126** |

**Defendant AT&T Inc.'s Response in Support of Transfer and
Centralization and in Favor of the Eastern District of North Carolina**

### INTRODUCTION

AT&T customer data was illegally downloaded from an AT&T workspace on a third-party cloud platform provided by Snowflake, Inc. ("Snowflake"). AT&T is not alone. The movant here—plaintiff Emmanuel Chaidez—alleges that at least 165 Snowflake clients and the data of "hundreds of millions" of people were impacted in what Chaidez calls the "Snowflake Data Breach."[1]

Plaintiffs allege that this cluster of alleged data security incidents was part of a "threat campaign" by "UNC5537," a "threat actor" suspected to have stolen a significant volume of records from Snowflake customer environments.[2] As of the date of this filing, 61 class actions have been filed in 12 federal jurisdictions across the country naming, in various combinations, Snowflake, Snowflake clients, or both. Advance Auto Parts, AT&T, Neiman Marcus, LendingTree, and Ticketmaster/Live

---

[1] Chaidez's Mem. in Supp. of Corrected Mot. to Transfer, MDL 3126 (J.P.M.L. July 30, 2024), ECF No. 2-1, n. 1 (hereafter "Mem. in Supp.").

[2] *See, e.g.*, Class Action Complaint, *Hornthal v. Snowflake, Inc., AT&T, Inc., and AT&T Mobility, LLC*, C.A. No. 2:24-cv-00068-TJC (D. Mt. July 25, 2024), ECF 1-18 at ¶¶ 39–41.

Nation have already been sued,[3] and other Snowflake clients may yet face litigation. In fact, Chaidez's counsel "anticipates the filing of many more" cases "in the coming weeks and months" naming Snowflake and additional Snowflake clients.[4] That does not appear to be an idle threat—there are numerous ongoing solicitations of plaintiffs for additional Snowflake litigation.[5]

---

[3] *Chaidez v. Advance Auto Parts, Inc.*, C.A. No. 5:24-cv-00354 (E.D.N.C. June 24, 2024), ECF 1-42; *Reichbart v. Neiman Marcus Grp. LLC and Snowflake, Inc.*, C.A. No. 0:24-cv-61389 (S.D. Fla. Aug. 1, 2024), ECF 20-10; *Rason v. Snowflake Inc. and Ticketmaster, L.L.C.*, C.A. No. 2:24-cv-00076-BMM (D. Mt. Aug. 6, 2024); ECF 20-7; *Nader v. Snowflake, Inc. and LendingTree, LLC*, C.A. No. 2:24-cv-00079-BMM (D. Mt. Aug. 15, 2024), ECF 67-4.

[4] Mem. in Supp., p. 2.

[5] *See, e.g.*, J. Lyon, *Snowflake Data Breach Investigation*, The Lyon Firm (June 11, 2024), https://www.thelyonfirm.com/blog/snowflake-data-breach-investigation/; *QuoteWizard (Snowflake) Data Breach Class Action Investigation and Lawsuit Assistance*, Console & Assocs. (June 12, 2024), https://www.myinjuryattorney.com/quotewizard-snowflake-data-breach-class-action-investigation-and-lawsuit-assistance/; *Lending Tree Data Breach – Class Action Investigation*, Chimicles Schwartz Kriner & Donaldson-Smith LLP, https://chimicles.com/lendingtree-data-breach-class-action-investigation/; *Santander Holdings U.S.A. Data Breach*, Kehoe Law Firm, P.C. (June 19, 2024), https://kehoelawfirm.com/santander-data-breach/; *Santander Data Breach*, Milberg Coleman Bryson Phillips Grossman, LLC (June 19, 2024), https://www.classaction.org/data-breach-lawsuits/santander-holdings-u.s.a.-inc-june-2024; *Santander Data Breach Investigation*, Strauss Borrelli PLLC (June 20, 2024), https://straussborrelli.com/2024/06/20/santander-data-breach-investigation/; *Snowflake Data Breach – Class Action Investigation*, Ahdoot & Wolfson, PC (July 24, 2024), https://www.ahdootwolfson.com/blog/snowflake-data-breach-class-action-investigation/; *CPM Investigating Data Breach at Snowflake Affecting Customers of Multiple Consumer-Facing Companies*, Cotchett Pitre & McCarthy LLP (Aug. 1, 2024), https://www.cpmlegal.com/cases-CPM-Investigating-Data-Breach-at-Snowflake-Affecting-Customers-of-Multiple-Consumer-Facing-Companies; *Live Nation Data Breach*, Levi & Korsinsky (Aug. 9, 2024), https://zfrmz.com/MJ7bBsA0zMVo7sQganzp?fbclid=IwY2xjawEwHhFleHRuA2FlbQIxMAABHQuN9d2GZDVme6uz26DUSS_H0pv_EVHHOaldCb7Of78cra9aj2tKKuMUMw_aem_IX8LbwJ6Q57Rm92ttjumFA.

Chaidez asks this Panel to transfer and consolidate all related actions to the District of Montana because the actions share common questions of fact and transfer will promote "the just and efficient conduct of the cases."[6] 28 U.S.C. § 1407(a). AT&T agrees that transfer and consolidation are appropriate. But Butte, Montana, is an inconvenient jurisdiction for an MDL involving so many plaintiffs and defendants—numbers that Chaidez and firms around the country promise will increase. As a result, AT&T supports centralization in the Eastern District of North Carolina before Judge Richard E. Myers II, who has already consolidated 11 Snowflake-related cases against Advance Auto Parts and set a schedule for appointment of interim counsel, filing of a consolidated class complaint, and dispositive motions.

**ARGUMENT**

**I.   Transfer and consolidation under Section 1407 is the only practical method of managing the litigation and avoiding inconsistent results.**

The Panel is empowered to transfer actions involving common factual questions to any district for coordinated or consolidated pretrial proceedings "for the convenience of parties and witnesses" and to "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407. The Panel generally orders transfer and

---

[6] Mem. in Supp., p. 4. This standard is different than the analysis required under Federal Rule of Civil Procedure 23. *See In re Trade Partners, Inc., Inv'rs Litig.*, 493 F. Supp. 2d 1381, 1381–82 (J.P.M.L. 2007). AT&T reserves all of its defenses to class certification, including the absence of common questions susceptible to common answers, *see Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), and the fact that common questions do not predominate over individualized ones, *see Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1436–37 (2013).

consolidation to avoid conflicting rulings, reduce litigation costs, and conserve the time and effort of the parties, attorneys, witnesses, and courts. *See, e.g.*, *In re KeyBank Customer Data Sec. Breach Litig.*, 655 F. Supp. 3d 1372, 1373 (J.P.M.L. 2023); *see also* Manual for Complex Litigation, Fourth § 20.131. These factors strongly support transfer and consolidation of related and tag-along actions and favor the Eastern District of North Carolina as the appropriate transferee court.

> **A.   Transfer of the related actions for consolidated proceedings will promote just and efficient control of the actions.**

The transfer and consolidation of related cases is warranted in this case for three reasons. **First**, actions arising out of a cluster of cyberattacks on customers of the same technology provider—in this case, Snowflake—present a common core of factual and legal questions. **Second**, the potential for conflicting or overlapping class actions addressing these common questions strongly favors centralization. **Third**, individualized questions regarding the intrusions into each Snowflake client's environment do not diminish the substantial benefits of consolidation.

> **1.   Actions arising out of a cluster of cyberattacks on customers of the same technology provider present a common core of factual and legal questions.**

Centralization is particularly appropriate where, as here, common disputes present fact issues that "may be quite technical and contentious." *In re Supervalu, Inc., Customer Data Sec. Breach Litig.*, 67 F. Supp. 3d 1377, 1378 (J.P.M.L. 2014). Section 1407 does not require "a complete identity of common factual issues or parties as a prerequisite to transfer." *In re FTC Cryptocurrency Exchange Collapse Litig.*, 677 F. Supp. 3d 1379, 1381 (J.P.M.L. 2023). Indeed, centralization is

4

appropriate, despite "the presence of additional facts or differing legal theories[,]" where actions "arise from a common factual core." *In re Home Depot, Inc. Customer Data Sec. Breach Litig.*, 65 F. Supp. 3d 1398, 1399 (J.P.M.L. 2014); *In re Am. Med. Collection Agency, Inc., Customer Data Sec. Breach Litig.*, 410 F. Supp. 3d 1350, 1353–54 (J.P.M.L. 2019) (similar).

Over the past year, the Panel has twice concluded that overlapping class actions arising out of a cluster of cyberattacks on various clients of a common technology service provider presented "common and complex factual questions." *In re Fortra File Transfer Software Data Sec. Breach Litig.*, MDL No. 3090, 2024 WL 436478, at *1 (J.P.M.L. Feb. 5, 2024); *see also In re MoveIt Customer Data Sec. Breach Litig.*, MDL No. 3083, 699 F. Supp. 3d 1402, 1405 (J.P.M.L. 2023). The Panel reasoned that "[c]entralization offers substantial opportunities to streamline pretrial proceedings; reduce duplicative discovery and conflicting pretrial obligations; prevent inconsistent rulings on common evidentiary challenges and summary judgment motions; and conserve the resources of the parties, their counsel, and the judiciary." *In re Fortra*, 2024 WL 436478, at *1; *see also In re MoveIt*, 699 F. Supp. 3d at 1405 (similar).

The same reasoning applies here given the factual and legal questions common to the complaints, including:

- how the "threat campaign" against Snowflake clients occurred;
- "the circumstances of the unauthorized access and data exfiltration";
- Snowflake's "response to" the unauthorized access; and

- "the response of various downstream [Snowflake] users and customer-facing defendants with whom plaintiffs did business."

*In re MoveIt*, 699 F. Supp. 3d at 1405. *See also* Mem. in Supp., at 4–6.

Indeed, the complaints allege common questions of law and fact relating to the respective duties of Snowflake and its clients, including whether Snowflake: (1) unlawfully disclosed plaintiffs' information; (2) failed to implement reasonable security procedures; (3) complied with applicable data security laws and regulations; (4) met industry standards; (5) owed and breached a duty to class members to safeguard their private information; (6) should have discovered and addressed unlawful activity sooner; or (7) had implied contacts with plaintiffs.[7]

These common questions about Snowflake's alleged duties cannot be assessed independent of the claims against Snowflake's clients.  Snowflake itself acknowledges that it "operates a 'shared responsibility' cybersecurity model" with all of its clients, "whereby responsibility for data security is divided between

---

[7] *See, e.g.*, *Bryant-Booker v. Snowflake Inc.*, C.A. No. 2:24-cv-00066-BMM (D. Mt. Jul. 24, 2024), ECF 1-16 at ¶ 103; *Armstrong v. Snowflake Inc.*, C.A. No. 2:24-cv-00058-BMM (D. Mt. July 17, 2024), ECF 1-10 at ¶ 95; *Rason v. Snowflake Inc. and Ticketmaster, L.L.C.*, C.A. No. 2:24-cv-00076-BMM (D. Mt. Aug. 6, 2024), ECF 20-7 at ¶ 128; *Bobbitt v. Snowflake Inc., and Adv. Stores Co., Inc.*, C.A. No. 2:24-cv-00071-BMM (D. Mt. July 30, 2024), ECF 13-3 at ¶ 135; *Giangiulio v. Snowflake, Inc.*, C.A. No. 2:24-cv-00060-JTJ (D. Mt. July 18, 2024), ECF 1-11 at ¶ 82 (discussing Snowflake's alleged duties in the context of data allegedly exfiltrated from Ticketmaster, Advance Auto Parts, Neiman Marcus, Lending Tree, and AT&T); *Townsend v. Snowflake Inc., and Adv. Stores Co., Inc.*. C.A. No:2:24-cv-00077-BMM (D. Mt. Aug. 7, 2024), ECF 67-3 at ¶ 101; *Miller v. Snowflake Inc., and AT&T, Inc.*, C.A. No. 2:24-cv-00067-JTJ (D. Mt. July 24, 2024), ECF 1-17 at ¶ 98; *Bowers v. Snowflake, Inc.*, C.A. No. 2:24-cv-00055-JTJ (D. Mt. July 10, 2024), ECF 1-7 at ¶ 52; *Reichbart v. Neiman Marcus Grp. LLC, and Snowflake, Inc.*, C.A. No:24-cv-61389-DSL (S.D. Fla. Aug. 1, 2024), ECF 20-10 at ¶ 58; *Conte v. Snowflake, Inc.*, C.A. No. 3:24-cv-04443-SK (N.D. Cal. July 23, 2024), ECF 101 ¶ 96.

Snowflake" and its clients.[8] There is simply no way to address common questions about Snowflake's alleged responsibilities without reference to a Snowflake client's alleged duties and obligations. Nor could a court address questions about a Snowflake client's alleged duties and obligations, without reference to Snowflake's alleged responsibilities under the "shared responsibility" cybersecurity model.

The merits of these or any other common questions—and speculation by the parties about how they might be decided—are not relevant here. The task before the Panel is to determine how to ensure that there is a **single answer** to these questions, which requires them to be presented to a **single judge** for resolution. That is the only way to "ensure that the actions are supervised by a single judge who, from day-to-day contact with all aspects of the litigation, will be in the best position to design a pretrial program that will . . . substantially conserve the time and efforts of the parties, the witnesses and the federal judiciary." *In re Res. Expl., Inc., Sec. Litig.*, 483 F. Supp. 817, 821 (J.P.M.L. 1980). Singular supervision will ensure non-duplicative discovery, consistent pretrial obligations, and consistent and efficient resolution of *Daubert*, class certification, and summary judgment motions. *In re MoveIt*, 699 F. Supp. at 1405.

---

[8] Snowflake's Resp. in Opp. to Mot. for Transfer and Coordination Pursuant to 28 U.S.C. § 1407, MDL No. 3124, ECF 30 at 5, 8 ("Snowflake's Resp.").

### 2. The potential for conflicting or overlapping class actions addressing these common questions strongly favors centralization.

Consistency in the class certification process, where there is a "potential for conflicting or overlapping class actions presents one of the strongest reasons for transferring such related actions to a single district for coordinated or consolidated pretrial proceedings which will include an early resolution of such potential conflicts." *In re Plumbing Fixtures*, 308 F. Supp. 242, 244 (J.P.M.L. 1970).

Here, the common questions discussed above are raised on behalf of putative classes that overlap in at least two ways. First, the proposed class definitions in the cases against Snowflake often subsume the proposed class definitions in the cases involving Snowflake clients. The complaints against Snowflake generally propose classes that would include anyone whose information was exfiltrated from a Snowflake client environment.[9] The cases against Snowflake clients generally propose classes that would represent a client-specific subset of those all-encompassing proposed classes.[10]

---

[9] *See, e.g.*, *Leal v. Snowflake, Inc.*, C.A. No. 2:24-cv-00046-BMM (D. Mt. June 28, 2024), ECF 1-4, ¶ 69 (proposing a class of "[a]ll individuals residing in the United States whose Private Information was compromised as a result of the Data Breach").

[10] *See, e.g.*, *Montgomery v. AT&T Inc.*, C.A. No. 3:24-cv-05581-BAT (W.D. Wash. July 18, 2024), ECF 1-34, ¶¶ 1, 47 (defining "Data Breach" as an incident involving "victims of a targeted cyberattack on AT&T" and proposing a "Nationwide Class" of "[a]ll natural persons residing in the United States whose personally identifiable information was exfiltrated in the Data Breach"); *Miller v. Ticketmaster, LLC, et al.*, C.A. No. 2:24-cv-05867 (C.D. Cal. July 11, 2024), ECF 1-32, ¶¶ 6, 81 (defining "Data Breach" as the theft of Ticketmaster's customer PII from Ticketmaster's "third-party cloud database provider by threat actors[,]" and proposing a nationwide class

Second, lawsuits against a single Snowflake client (whether named with or without Snowflake) may propose classes that—read at their broadest—could include individuals with relationships to Snowflake clients *other* than AT&T.[11] In these instances, the proposed class in a case against AT&T, for example, would overlap with the proposed classes not only in other cases against AT&T, but also in cases against other Snowflake clients. And, of course, an AT&T customer who is part of one or more putative classes in cases against AT&T could also be an impacted customer of Neiman Marcus, Advance Auto Parts, or of any number of Snowflake clients and therefore be included in multiple proposed classes in cases related to Snowflake. Similar issues exist across lawsuits filed against other Snowflake clients. The risk of conflicting rulings on class certification and merits issues in cases involving the same or overlapping classes is obvious. The remedy for avoiding that result and ensuring prudent resource distribution is to consolidate these cases in an MDL.

---

of "[a]ll individuals in the United States whose PII was compromised in the Data Breach that was confirmed by" Ticketmaster).

[11] *Miller v. Snowflake Inc., and AT&T, Inc.*, C.A. No. 2:24-cv-00067-JTJ (D. Mt. July 24, 2024), ECF 1-17, ¶¶ 8, 94 (defining the "Data Breach" as the alleged theft of data "from a significant volume of Snowflake's corporate customers" and proposing a class of "[a]ll individuals in the United States whose PII was compromised in the Data Breach which AT&T noticed on or about July 17, 2024").

### 3. Individualized questions regarding the intrusions into each client's environment do not diminish the substantial benefits of consolidation.

Opponents of consolidation may attempt to downplay the substantial benefits of coordination and claim that individualized issues will predominate. But this Panel has rejected such arguments in comparable cases.

First, opponents may characterize the intrusions as individualized, focusing on each defendant's role as to "numerous successive intrusions into" Snowflake's customer environments. *In re MoveIt*, 699 F. Supp. 3d at 1405; *see also In re Fortra*, 2024 WL 436478, at *2. But as the Panel recognized in *Fortra* and *MoveIt*, "disentangling" the allegations against the technology provider from those against its clients—especially where plaintiffs allege, and Snowflake acknowledges, a "shared responsibility" for cybersecurity common to all Snowflake clients—"seems impracticable if not impossible." *In re* MoveIt, 699 F. Supp. 3d at 1405. That will be true "regardless of whether [Snowflake] is named as a defendant in a particular case." *In re Fortra*, 2024 WL 436478, at *2.

Second, parties opposing consolidation may cite *In re Accellion*, where the Panel declined to transfer and consolidate cases relating to a file transfer application. *See In re Accellion, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 1372, 1373–74 (J.P.M.L. 2021). But this case is a far cry from *Accellion*. *Accellion* involved the breach of a discontinued file transfer application that had a smaller number of impacted users and related actions "pending in just three courts before three judges." *Id.* at 1373. The Panel found this significant, commenting in *In re Fortra* that "[i]n contrast to the product at issue in *Accellion*,

10

Fortra's transfer software here is used by over a hundred organizations—seemingly far from a 'legacy' product." 2024 WL 436478, at *2.

Here, as in *Fortra*, Snowflake continues to offer its services, and Chaidez says "there are at least 165 entities whose data was impacted in the Snowflake Data Breach." Mem. in Supp., n. 1. There are already 61 federal class actions pending in 12 jurisdictions, and plaintiffs have threatened that even more lawsuits are on the way. Under these circumstances, centralization through an MDL is warranted.

    **B.**    **Consolidation under Section 1404 is not a practical substitute for MDL consolidation here.**

Transfer and consolidation under Section 1407 represents the only practical method of managing the litigation and avoiding inconsistent results. To be sure, "[w]here a reasonable prospect exists that the resolution of a Section 1404 [change-of-venue] motion or motions could eliminate the multidistrict character of a litigation, transfer under Section 1404 is preferable to centralization." *In re 3M Co. Lava Ultimate Prods. Liab. Litig.*, 222 F. Supp. 3d 1347, 1347–48 (J.P.M.L. 2016). But that is true only in situations involving "a minimal number of actions" *Id.* at 1347; *see also In re Transocean Ltd. Sec. Litig. (No. II)*, 753 F. Supp. 2d 1373, 1374 (J.P.M.L. 2010).

The Panel has not required parties to resort to Section 1404 in cases involving the numbers of cases, parties and jurisdictions at issue here. For example, in *In re Roundup Products Liability Litigation*, the Panel concluded that "informal coordination among the involved courts and counsel [wa]s not practicable" because

the matter involved 37 actions, pending in 21 districts, with over 10 law firms representing plaintiffs. 214 F. Supp. 3d 1346, 1348 (J.P.M.L. 2016). The Panel reasoned, as it should here, that "[e]ven if no additional actions [we]re filed, the present number of cases, districts, and involved counsel, as well as the complexity of the issues presented, warrant[ed] centralization." *Id.*

Indeed, the Panel has consolidated cases in situations involving far fewer actions and courts. *See, e.g.*, *In re 23andMe, Inc., Customer Data Sec. Breach Litig.*, 2024 WL 1596923, at *2 (J.P.M.L. Apr. 11, 2024) (finding centralization appropriate even where related-case procedures led to assignment of all matters to just three judges in three districts because "[a]ll actions are putative nationwide or statewide class actions involving overlapping classes, and over four dozen plaintiffs' firms are involved"); *In re Prepared Food Photos, Inc., Copyright Litig.*, 678 F. Supp. 3d 1391 (J.P.M.L. 2023) (informal coordination unworkable where matters against the defendant "will remain pending in four districts before six judges" and "estimates of future case filings have ranged from 21 to 75 cases").

The possibility that some defendants may be able to organize the actions against them in *different* jurisdictions does not obviate the need for an MDL, given the common questions about the respective duties of Snowflake and others that risk inconsistent answers across jurisdictions. *In re Fortra*, 2024 WL 436478, at *2 (although parties had organized cases in a few districts, "we view centralization as creating more efficiencies and requiring the management efforts of many fewer judges to establish a pretrial structure, facilitate coordination across districts, and make procedural and substantive rulings").

12

Moreover, initial coordination efforts are unlikely to suffice if plaintiffs' promise of additional lawsuits involving additional defendants holds true. Or if, for example, there are claims among Snowflake and its clients "in cases in which the plaintiffs have not named them" both. *In re MoveIt*, 699 F. Supp. 3d at 1406. Any assertion that a party "intend[s] to move to consolidate" certain matters and "transfer" of others[12] but has not yet done so, even for pending cases, let alone ones that may be filed in the future, only emphasizes the need for transfer and consolidation under Section 1407. That is the only practical method of managing the litigation, accommodating cases yet to be filed, and avoiding inconsistent results.

## II.  The Eastern District of North Carolina is the appropriate transferee forum.

Chaidez identifies the District of Montana as the appropriate transferee court because that is where Snowflake is incorporated. Mem. in Supp., at 7. But there is no evidence that Montana is the center of Snowflake's operations. Indeed, although Chaidez states "on information and belief" that Snowflake's servers are located in Montana (*id.* at 7), that conjecture is contradicted by publicly available information. Snowflake states that "[m]ultiple [cloud] regions are provided to allow your organization to meet its individual compliance requirements for general purpose use. Additional US regions are provided for organizations that must comply with

---

[12] Snowflake's Resp., at 7.

13

US government regulations."[13] Indeed, Snowflake's map of cloud locations suggests its servers are in locations across the United States **other than Montana:**



Map of Snowflake's U.S. Cloud Regions.[14]

Nor is there any evidence that this MDL would benefit from being transferred to the place of incorporation of any particular defendant. Like *Fortra*—which was not transferred to the home of the technology provider whose clients had also been sued—the benefits of consistency and efficiency in a hub-and-spoke case can be achieved in virtually any court where cases are pending.

Of those courts, the Eastern District of North Carolina is the most appropriate transferee forum based on factors traditionally considered by the Panel, including: connection to the litigation; convenience of the parties; the number of

---

[13] Snowflake Supported Cloud Regions, available at https://docs.snowflake.com/en/user-guide/intro-regions#north-south-america (last accessed Aug. 18, 2024).

[14] *Id.*

14

cases pending in the jurisdiction; and the experience, skill, and caseloads of the available judges. *See, e.g., In re Samsung Customer Data Sec. Breach Litig.*, 655 F. Supp. 3d 1368, 1369 (J.P.M.L. 2023); *In re Baycol Prods. Liab. Litig.*, 180 F. Supp. 2d 1378, 1380 (J.P.M.L. 2001).

As an initial matter, the Honorable Richard E. Myers II of the Eastern District of North Carolina has already taken decisive action to consolidate and schedule 11 Snowflake-related cases filed against Advance Auto Parts, which is based in that District.

Moreover, docket conditions are more favorable in the Eastern District of North Carolina than in Montana. Although the District of Montana has fewer pending cases, it also has fewer judges and magistrates to adjudicate them. More than 15% of cases in that District have been pending more than three years, but only 6% of cases in the Eastern District of North Carolina have been pending that long. And the median time from filing to disposition is 10.4 months in Montana versus 7.4 months in North Carolina. *See* Combined U.S. District Courts Civil and Criminal Federal Court Management Statistics, June 30, 2024, available at https://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2024/06/30-1.

Additionally, the Eastern District of North Carolina will be convenient for the parties. Wilmington International Airport is less than 11 minutes from the courthouse with direct flights to many major cities (Miami, Fort Lauderdale, Fort Myers, Tampa, Orlando, Atlanta, Dallas, Minneapolis, Chicago, Charlotte,

Washington, Baltimore, Wilmington (DE), Philadelphia, New York, Newark, New Haven, Hartford, Providence, Boston).

It is no wonder that the Panel has recognized the Eastern District of North Carolina as convenient in other matters transferred there. *See In re Panacryl Sutures Prods. Liab. Litig.*, MDL No. 1959 (J.P.M.L. August 18, 2008), ECF 12 (recognizing the Eastern District of North Carolina would "serve the convenience of the parties and witnesses" where actions were "pending in federal districts throughout the United States."); *In re Peanut Crop Ins. Litig.*, MDL No. 1634 (J.P.M.L. Oct. 26, 2004), ECF 13 (selecting the Eastern District of North Carolina— where one case was pending—as the MDL transferee district, despite related cases pending in Texas, Georgia, South Carolina, Virginia, Florida and Alabama in part because it was "well equipped with the resources that this docket is likely to require").

In contrast, Montana presents inconveniences for the parties. The closest airport to the Butte courthouse is regional (Bert Mooney Airport) with one nonstop flight a day to Salt Lake City. Great Falls, where Judge Morris sits, is over two hours away from Butte by car, and its airport has only 7 direct flights a day (Salt Lake, Denver, Seattle, Minneapolis, Las Vegas, Chicago, Phoenix). Similarly, other airports (Billings, Bozeman, Glacier and Missoula) have limited direct flights and range from one to four hours from the courthouse by car.[15]

---

[15] In MDL 3124—proposed as an alternative MDL against AT&T and Snowflake (and since disavowed by the movant)—an interested party asserts the Panel should consider the Northern District of Texas as a transferee court for an AT&T MDL based on positions taken by AT&T in MDL 3114. But MDL 3114 is not related to

16

Accordingly, the Eastern District of North Carolina is the more convenient and appropriate transferee court for an MDL. But to the extent the Panel disagrees, AT&T would support centralization in the District of Montana, as an alternative.

## CONCLUSION

The related actions filed to date against Snowflake and its clients share common questions of fact and consolidation and transfer of those actions will promote "the just and efficient conduct of cases." The Panel should, therefore, transfer and consolidate related actions and future tag-a-long actions under 28 U.S.C. § 1407.

Because the Eastern District of North Carolina has a strong connection to the related actions, is conveniently located, and has the capacity to administer the cases, it is the appropriate transferee court. If the Panel disagrees, the District of Montana is an appropriate, if inconvenient, alternative.

---

the Snowflake breaches at issue here and is easily distinguishable. In MDL 3114, the overwhelming majority of cases had already been filed and consolidated before The Honorable Ada Brown (N.D. Tex.)—which is not the case here. And there, fewer than 5% of potentially impacted AT&T customer accounts were wireless, whereas here, the vast majority of impacted AT&T customer accounts relate to the wireless businesses of AT&T Mobility, LLC, and Cricket Wireless, LLC, which are both incorporated in Georgia and have been named as defendants in several cases. *See AT&T Inc.'s Supp. Resp. in Supp. of Transfer to and Centralization in the Northern District of Texas*, MDL No. 3114, ECF 93 at 1. Most importantly, the cases against AT&T here are subsumed within a wider universe of cases bound by a common technology provider (*i.e.*, Snowflake) that demand the formation of a broader MDL in North Carolina or, alternatively, in Montana. A single interested party's desire for an AT&T-specific MDL in the Northern District of Texas does not materially alter this analysis.

Finally, if the Panel denies the motion to transfer in *In re Snowflake* then—and only then—AT&T supports the formation of MDL No. 3124 and transfer to the Honorable Victoria Calvert in the Northern District of Georgia as set forth in AT&T' response filed on August 19, 2024. *See* MDL 3114, ECF 24 at 3.

Dated: August 21, 2024               Respectfully submitted,

*/s/ Gilbert S. Keteltas*
Gilbert S. Keteltas
BAKER HOSTETLER LLP
1050 Connecticut Avenue, NW, Ste. 1100
Washington, D.C. 20036
Tel.: (202) 861.1530
Fax: (202) 861.1783
Email: gketeltas@bakerlaw.com

*Attorney for Defendant AT&T Inc.*

18