# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: SNOWFLAKE DATA BREACH LITIGATION | **MDL DOCKET NO. 3126** |

## SNOWFLAKE'S RESPONSE IN OPPOSITION TO MOTION FOR TRANSFER AND COORDINATION PURSUANT TO 28 U.S.C. § 1407

SNOWFLAKE'S OPPOSITION IN
RESPONSE TO MOTION FOR TRANSFER

**TABLE OF CONTENTS**

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ............................................................................................................................4

        A.      Snowflake Provides the AI Data Cloud—a Self-Managed Service that Customers Use and Control as Part of their Unique Data-Management Strategy ...................................................................................................................4

        B.      Threat Actors Gain Unauthorized Access to Certain Customers' Accounts Not by Breaching Snowflake's Security But by Stealing Valid Customer Log-In Credentials ........................................................................................................5

        C.      Filed Cases and Ongoing Coordination Efforts ........................................................7

ARGUMENT ..................................................................................................................................8

I.      MOVANT HAS FAILED TO MEET HIS BURDEN TO SHOW CENTRALIZATION IS NECESSARY OR DESIRABLE ................................................8

        A.      The Minimal Factual Overlap Between Cases Counsels Against Centralization .............................................................................................................8

        B.      The Requested Centralization Would Inconvenience the Parties and Witnesses ................................................................................................................11

        C.      Centralization is Not Efficient Here ......................................................................12

CONCLUSION .............................................................................................................................14

# TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Accellion, Inc., Customer Data Sec. Breach Litig.*,
   543 F. Supp. 3d 1372 (J.P.M.L. 2021) ................................................................................8

*In re Best Buy Co., Inc., Cal. Song-Beverly Credit Card Act Litigation*,
   804 F. Supp. 2d 1376 (J.P.M.L. 2011) ................................................................................8

*In re Comcast Corp.*,
   190 F. Supp. 3d 1344 (J.P.M.L. 2016) ..............................................................................11

*In re Energy Drilling, LLC Litig.*,
   140 F. Supp. 3d 1333 (J.P.M.L. 2015) ................................................................................8

*In re Fortra File Transfer Software Data Sec. Breach Litig.*,
   2024 WL 436478 (J.P.M.L. 2024) ....................................................................................10

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*,
   38 F. Supp. 3d 1380 (J.P.M.L. 2014) ................................................................................11

*In re MOVEit Customer Data Sec. Breach Litig.*,
   699 F. Supp. 3d 1402 (J.P.M.L. 2023) ..........................................................................9, 10

*In re OSF Healthcare Sys. Emp. Ret. Income. Sec. Act (ERISA) Litig.*,
   223 F. Supp. 3d 1343 (J.P.M.L. 2016) ..............................................................................12

*In re Varsity Athlete Abuse Litig.*,
   677 F. Supp. 3d 1376 (J.P.M.L. 2023) ..............................................................................12

**Statutes**

28 U.S.C. § 1404 ...........................................................................................................................11

28 U.S.C. § 1407 ..............................................................................................................1, 7, 8, 11

Defendant Snowflake Inc. ("Snowflake") respectfully submits this response in opposition to the motion to transfer filed by Plaintiff Emmanuel Chaidez ("Movant") pursuant to 28 U.S.C. § 1407 for Consolidated or Coordinated Pretrial Proceedings.

**PRELIMINARY STATEMENT**

Pending before the Panel are two competing motions to transfer (each a "Motion," together the "Motions") that arise out of a series of separate incidents whereby threat actors gained unauthorized access to certain Snowflake customers' accounts and allegedly exfiltrated certain data.[1] The instant Motion seeks to create a so-called "hub-and-spoke" MDL on a misguided theory that Snowflake is the "hub" that was breached and its customers were the "spokes" whose data was exfiltrated. That is wrong, and the Motion should be denied.

An MDL is neither appropriate nor necessary because this is *not* a hub-and-spoke scenario. Rather, it is a series of *separate* intrusions. Multiple investigations have revealed *no* evidence suggesting the unauthorized access was caused by a vulnerability, misconfiguration, or breach of Snowflake's platform. Instead, threat actors stole valid log-in credentials from the customers' employees or contractors and were able to access certain accounts that the customers had not secured with multi-factor authentication ("MFA") or network access policies. The cases against each customer implicate myriad individualized factual questions that do not implicate Snowflake at all, including how the particular customer's credentials came to be in possession of the threat actor, the particular type and sensitivity of the data accessed (which vary by customer), and the

---

[1] The competing Motion (MDL No. 3124) also pending before this Panel seeks to centralize cases arising from the unauthorized access into AT&T's Snowflake account. *See In re AT&T Inc. Cellular Customer Data Sec. Breach Litig.*, MDL No. 3124, Dkt. No. 1 (J.P.M.L. 2024). The Panel should deny that Motion for the reasons set forth in Snowflake's opposition to that Motion. *Id.* at Dkt. No. 30.

particular steps that the customers took—or determined were not necessary—to secure their data. There will be little overlap in the evidence relevant to the claims against the customer defendants. For example, whether Ticketmaster employed adequate controls to secure its account is irrelevant to the question of whether AT&T was negligent, and vice versa.

The claims against Snowflake are of a different nature entirely. It is a matter of public record that Snowflake made MFA and other security tools available to its customers and recommended that they use them. The customers could also use third-party tools to secure their Snowflake accounts. While the plaintiffs suing Snowflake customers generally allege that threat actors were able to access the customers' accounts because the customers failed to implement one or more of these available security tools, *see, e.g.*, *Young v. AT&T*, No. 24-cv-3185, Dkt. No. 1 (N.D. Ga. 2024) (alleging AT&T was negligent because "multi-factor authentication was not required to access the sensitive customer records"), the plaintiffs suing Snowflake assert a different theory—that Snowflake should have done more to *ensure* that its customers were adequately securing their accounts (for example, by *mandating* use of MFA), rather than permitting its customers (some of the most sophisticated companies in the world) to make their own choices driven by their unique business needs, *see, e.g.*, *Leal v. Snowflake*, No. 24-cv-00046-BMM, Dkt. No. 3 (D. Mont. 2024)(alleging "Snowflake could have easily prevented the Data Breach by *requiring* all users to use multi-factor authentication") (emphasis added). Even if there were merit to the theory asserted against Snowflake, it is discrete and distinct from the issues that will pervade the cases against the customers. These stark differences among the defendants would make the proposed MDL inefficient and impractical.

Indeed, in recognition of these basic facts, the parties have made extensive efforts to consolidate the various litigations into separate proceedings centered on each defendant

(Snowflake and each of the customers). Chief Judge Morris of the District Court for the District of Montana has already assigned all 20 actions against Snowflake pending in that District to himself and marked them related. Today, Snowflake will move to file a motion to consolidate all such cases—with consent from many of the Plaintiffs already in hand—and is also in the process of moving to transfer to Montana the few cases against Snowflake that have been filed outside of Montana. The related cases against Advance Auto Parts have *already* been consolidated and are proceeding in the District of North Carolina. The Plaintiffs suing Ticketmaster have filed an unopposed motion for consolidation in the Central District of California, where the majority of the claims against Ticketmaster are pending. Three single cases—against Neiman Marcus (S.D. Fla., LendingTree (D. Mont.), and Cricket Wireless (N.D. Ga.)—do not require consolidation.

The Panel has repeatedly emphasized that centralization under Section 1407 "should be the last solution after considered review of all other options." *In re Comcast Corp.*, 190 F. Supp. 3d 1344, 1345 (J.P.M.L. 2016) (cleaned up). Given ongoing coordination efforts, the few common questions among these defendant-centric consolidated actions will be efficiently addressed through informal cooperation and third-party discovery.[2] An MDL simply is not necessary. In fact, it is almost sure to create inefficiency, confusion, and delay.

For these reasons, Movant's request for an MDL should be denied.

---

[2] Snowflake attaches as Appendix A a list of all cases of which it is aware that name it as a defendant. The cases pending before Chief Judge Morris are highlighted in blue. Broome Decl. at ¶ 2.

**BACKGROUND**

A. **Snowflake Provides the AI Data Cloud—a Self-Managed Service that Customers Use and Control as Part of their Unique Data-Management Strategy**

Snowflake provides customers with the AI Data Cloud, software for warehousing, managing, and sorting data.[3] The AI Data Cloud is a self-managed service, meaning that each of Snowflake's customers controls and manages its own data environment.[4] The data that customers upload to the Snowflake platform for storage and processing is encrypted.[5] As a result, Snowflake has limited visibility into the contents or movement of customer data, activity within customers' Snowflake accounts, and their security configurations. Most organizations use the AI Data Cloud as one part of their overall data strategy and in conjunction with many other types of software.

Each organization's data strategy and risks are different. For this reason, Snowflake operates within a "shared responsibility" cybersecurity model.[6] At a high level, Snowflake is responsible for ensuring the security of its platform and underlying infrastructure, while customers are responsible for selecting, enabling, and configuring access controls for their individual accounts.[7]

---

[3] *See Snowflake Documentation: Key Concepts,* https://docs.snowflake.com/en/user-guide/intro-key-concepts (last visited Aug. 13, 2024) ("Snowflake enables data storage, processing, and analytic solutions . . .").

[4] *Id.*

[5] *Snowflake Documentation: Managing Encryption,* https://docs.snowflake.com/en/user-guide/security-encryption-manage (last visited Aug. 13, 2024) ("All Snowflake customer data is encrypted by default using the latest security standards and best practices.").

[6] *Snowflake Shared Responsibility Model Report,* https://www.snowflake.com/en/resources/report/snowflake-shared-responsibility-model/ (last visited Aug. 13, 2024).

[7] *Id.*

B. **Threat Actors Gain Unauthorized Access to Certain Customers' Accounts Not by Breaching Snowflake's Security But by Stealing Valid Customer Log-In Credentials**

Beginning around April of 2024, threat actors gained unauthorized access to certain of Snowflake's customers' accounts. Multiple investigations, including by outside cybersecurity experts, have found no evidence suggesting the unauthorized access was caused by a vulnerability, misconfiguration, or breach of Snowflake's AI Data Cloud.[8] Rather, it appears that the threat actors stole valid account credentials (from non-Snowflake devices) belonging to the customers' respective employees or contractors and used them to access the customers' respective accounts within the AI Data Cloud.[9] It appears that the threat actors obtained these valid credentials through "infostealer malware" infections of the customers' employees' devices that dated as far back as 2020.[10] There is no evidence that these customers' credentials were stolen through Snowflake's platform or systems.[11]

The only Snowflake customers affected appear to be those whose user credentials had been breached or stolen *and* who did not have MFA or network-access policies enabled for their accounts. In other words, for accounts where the customer had not set up MFA or network-access policies, all the threat actors needed to log in to the customer's account were the stolen user credentials.

---

[8] *See, e.g.*, *UNC5537: Snowflake Data Theft and Extortion,* Google Cloud Blog (Aug. 8, 2023), https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion ("Mandiant's investigation has not found any evidence to suggest that unauthorized access to Snowflake customer accounts stemmed from a breach of Snowflake's enterprise environment.").

[9] *Id.* ("every incident Mandiant responded to associated with this campaign was traced back to compromised customer credentials").

[10] *Id.*

[11] *Id.* ("These credentials were primarily obtained from multiple infostealer malware campaigns that infected non-Snowflake owned systems.").

Access to one customer account does not provide access to other customer accounts so the threat actors required valid credentials for each customer's account to gain access to that customer's account and data. Thus, the circumstances under which threat actors accessed each customer's account necessarily vary by customer.

The threat actor or actors allegedly exfiltrated certain of the data to which they had gained access and, in some instances, placed it for sale on the dark web.[12] The allegedly exfiltrated data, and whether it was offered for sale, varies. For instance, threat actors are purporting to offer for sale the names and addresses of people who purchased tickets on Ticketmaster, along with their emails, phone numbers, and partial credit card numbers.[13] For AT&T users, the threat actors apparently exfiltrated records of customer call and text interactions that occurred during a brief period in 2022 and a single day in 2023, but did not exfiltrate personally identifiable information, and do not appear to have offered the data for sale.[14] For Advance Auto Parts, the threat actors allegedly exfiltrated employee records, including social security numbers.[15] For LendingTree subsidiary QuoteWizard, the threat actors allegedly exfiltrated consumers' names, residential

---

[12] *UNC5537: Snowflake Data Theft and Extortion,* Google Cloud Blog (Aug. 8, 2023), https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion.

[13] *Hackers Breach Ticketmaster Data, Put 560M Users' Data Up for Sale,* HackRead (Aug. 7, 2023), https://hackread.com/hackers-ticketmaster-data-breach-560m-users-sale/.

[14] *AT&T Inc. SEC Filing,* https://otp.tools.investis.com/clients/us/atnt2/sec/sec-show.aspx?FilingId=17677638&Cik=0000732717&Type=PDF&hasPdf=1 (last visited Aug. 13, 2024).

[15] Advance Auto Parts Discloses Potential Data Breach Impacting Customer Information, Cybersecurity Dive (Aug. 16, 2024), https://www.cybersecuritydive.com/news/advance-auto-parts-snowflake-data-breach/721353/.

addresses, and dates of birth.[16] And for Neiman Marcus, the threat actors allegedly exfiltrated consumer information including names, emails, addresses, phone numbers, and dates of birth.[17]

C. **Filed Cases and Ongoing Coordination Efforts**

Following the notices of unauthorized access, plaintiffs began filing suits against Snowflake and certain of its customers. To date, the only Snowflake customers sued are Ticketmaster/Live Nation, Advance Auto Parts, AT&T, LendingTree/QuoteWizard, and Neiman Marcus. Some cases are against only a customer, others are only against Snowflake, and yet others name both Snowflake and one of its customers as co-defendants. No case filed to date names Snowflake and more than one customer as co-defendants.

The cases against Snowflake and its customers are largely already organized by defendant-entity:

- Snowflake: 20 of 27 cases against Snowflake have been filed in the District of Montana, where they are related before Chief Judge Brian Morris. Snowflake will move to consolidate all such cases—with consent from many of the Plaintiffs—before Chief Judge Morris. Broome Decl. at ¶ 3. Snowflake is also coordinating with plaintiffs' counsel in the non-Montana actions in an attempt to transfer those cases to the District of Montana and, if necessary, to sever the claims against Snowflake from claims against any other customer defendant. Broome Decl. at ¶ 4.

- Advance Auto Parts: Most of the cases against Advance Auto Parts are pending in the Eastern District of North Carolina and have already been consolidated in that District. *See In re Advance Stores Co., Inc., Data Breach Litig.*, Case No. 5:24-cv-00352, Dkt. Nos. 13, 20 (D.N.C. 2024). With respect to cases against Advance Auto Parts pending in other districts, we are informed that Advance Auto Parts intends to move to sever any claims against it from actions where Snowflake is named a co-defendant, and then move to transfer the Advance Auto Parts claims to the Eastern District of North Carolina to be consolidated with the primary proceeding. Broome Decl. at ¶ 5.

---

[16] *Nader v. Snowflake, Inc. and Lending Tree, LLC*, Case No. 24-cv-79-BU-BMM, Dkt. No. 1 at ¶ 6 (D. Mon. 2024).

[17] *Reichbart v. Neiman Marcus Group LLC and Snowflake, Inc.*, Case No. 24-cv-61389, Dkt. No. 1 at ¶ 1 (S.D. Fla. 2024).

- Ticketmaster/Live Nation: Most of the cases against Ticketmaster/Live Nation are pending in the Central District of California. The plaintiffs there have filed an unopposed motion to consolidate the cases in that district. *See Ryan, et al. v. Ticketmaster, LLC, et al.*, Case No. 2:24-cv-04482, Dkt. Nos. 32, 36, 38 (C.D. Cal. 2024).

- Neiman Marcus: Only one case, filed in the Southern District of Florida, names Neiman Marcus as a defendant; Snowflake is a co-defendant. *See Reichbart v. Neiman Marcus Group LLC and Snowflake, Inc.*, Case No. 24-cv-61389 (S.D. Fla. 2024); Snowflake has contacted plaintiff's counsel to discuss severing of claims against Neiman Marcus and transferring the claims against Snowflake to the District of Montana. Broome Decl. at ¶ 6.

- LendingTree: Only one case, filed in the District of Montana, names LendingTree as a defendant; Snowflake is a co-defendant. *See Nader v. Snowflake, Inc. and LendingTree, LLC*, Case No. 2:24-cv-00079 (D. Mon. 2024). Snowflake intends to discuss with plaintiff's counsel severing of claims against Snowflake. Broome Decl. at ¶ 7.

## ARGUMENT

### I. MOVANT HAS FAILED TO MEET HIS BURDEN TO SHOW CENTRALIZATION IS NECESSARY OR DESIRABLE

To succeed in his bid to centralize the litigation pursuant to 28 U.S.C. § 1407, Movant must show: (1) common questions of fact among the cases; (2) consolidation serves the convenience of the parties and witnesses; and (3) transfer and consolidation serve the just and efficient conduct of the actions. 28 U.S.C. § 1407. The movant bears the burden of persuasion on all three factors. *In re Best Buy Co., Inc., Cal. Song-Beverly Credit Card Act Litigation*, 804 F. Supp. 2d 1376, 1379 (J.P.M.L. 2011). Movant does not meet this burden on any of the three factors.

### A. The Minimal Factual Overlap Between Cases Counsels Against Centralization

The Panel regularly denies centralization where cases present minimal factual overlap, or where the common inquiries are not complex. *See, e.g.*, *In re Accellion, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 1372, 1374 (J.P.M.L. 2021) (denying consolidation and transfer where "any factual overlap . . . may be eclipsed by factual issues specific to each client defendant");

*In re Energy Drilling, LLC Litig.*, 140 F. Supp. 3d 1333, 1334 (J.P.M.L. 2015) (denying consolidation because of "limited factual overlap").

The Panel's decision in *In re Accellion, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 1372 (J.P.M.L. 2021), is particularly instructive. There, consumer plaintiffs alleged a security vulnerability in Accellion's file-transfer product, which impacted many of Accellion's customers. *Id.* at 1373. The Panel denied centralization, reasoning that "[a]ny factual overlap among the actions as to Accellion's [] product [and] its vulnerability to attack . . . may be eclipsed by factual issues specific to each client defendant." *Id.* The Panel recognized that "rather than a single data breach, there were numerous data breaches of each client defendant, occurring at different times and involving each client defendant's own servers." *Id.* Moreover, "each client defendant's knowledge of the [product's] alleged vulnerability to attack will be unique, as will Accellion's alleged efforts to urge each client to migrate to its newer file sharing product." *Id.* Other "unique factual issues" include "when each client was made aware of a data breach and when it notified its customers and/or employees." *Id.* The same reasoning applies here.

Here, as in *Accellion*, the factual overlap between the cases (if any) is overwhelmingly outweighed by highly individualized factual inquiries into each defendant. The cases against each of Snowflake's customers involve *separate* incidents of unauthorized access into *independent* systems. The claims against each customer will revolve around highly individualized factual and legal issues, including: (1) the particular customer's representations, commitments and obligations to its own users, customers, or employees; (2) the content and sensitivity of the data allegedly exfiltrated from each account (an issue into which Snowflake lacked visibility); (3) the method by which each customer's credentials were stolen; and (4) each customer's knowledge of their

respective security protocols and their assessment of whether those protocols were adequate to protect the type of data at issue (a process in which Snowflake was not involved).

By contrast, the claims against Snowflake will focus on Snowflake's obligations (if any) to its customers' consumers or employees—with whom Snowflake was not in privity and had no contact—and its duties (if any) to ensure that its customers (some of the most sophisticated companies in the world with robust security professionals, layered network security measures, and expansive cybersecurity practices) implemented appropriate security practices with respect to data into which Snowflake had only limited (if any) visibility.

Movant lists six purported factual and legal similarities between the cases he seeks to centralize. Mot. at 5-6. But he fails to recognize that the answers to his questions—*i.e.*, whether Snowflake or its customers breached contractual obligations, caused injury to consumers, violated the common law, etc.—will vary depending on which defendant the question pertains to.

Movant's reliance on *In re MOVEit Customer Data Sec. Breach Litig.*, 699 F. Supp. 3d 1402 (J.P.M.L. 2023) is misplaced. The case serves as a stark point of contrast. In *MOVEit*, the plaintiffs alleged a *single* vulnerability in MOVEit's servers that impacted many of its customers—a genuine hub-and-spoke scenario. *Id.* at 1405. That fact was central to the Panel's decision to create an MDL: the "MOVEit vulnerability is at the core of all of the cases . . . disentangling the allegations against Progress from the allegations against other defendants in the same case seems impracticable, if not impossible." *Id.* at 1405-06. Here, in stark contrast, only the "spokes" (*i.e.* the customers) suffered the unauthorized access, and for reasons only the spokes can explain, as

the threat actors exploited the customers' *separate* security practices; they did not breach Snowflake's security.[18]

At most, the cases overlap to the extent plaintiffs allege Snowflake should have done more to assist its customers in implementing appropriate security practices. But that is a discrete issue that can be litigated against Snowflake separately and efficiently. It does not require erecting a large-scale MDL that would include many other disparate factual issues irrelevant to the claims against Snowflake. The first factor therefore weighs in favor of denying Movant's request for centralization.

B.   **The Requested Centralization Would Inconvenience the Parties and Witnesses**

The second factor, convenience of the parties and witnesses, also counsels against centralization—particularly given the parties are already coordinating to self-organize these cases. Movants argue that "Montana is the nexus of Snowflake's operations, making it the Data Breach 'hub.' Documents, relevant witnesses . . . and other evidence for discovery are all located in Montana." Mot. at 8. Movant fails to identify any support for this conclusory statement, but it is not accurate. Few if any of the events giving rise to the plaintiffs' claims against the customer defendants arose in Montana, and Snowflake is not aware of any relevant witnesses or documents located there. Rather, the key witnesses and evidence for each incident of unauthorized access to

---

[18]  Snowflake is aware that the Panel centralized *In re Fortra File Transfer Software Data Sec. Breach Litig.*, 2024 WL 436478 (J.P.M.L. 2024), a case that Movant does not cite. But that decision, too, is distinguishable, as it also involved a *single* breach of Fortra's systems, whereas this case involved *multiple* and *independent* attacks against Snowflake's customers, not exploitation of a vulnerability in Snowflake's *own* systems. In other words, *Fortra* and *MOVEit* involved breaches of the "hub" that gave threat actors access to data belonging to the spokes, and thus MDLs made sense in those cases. The cases Movant seeks to centralize involve unauthorized access into accounts of the spokes *though* the spokes' access points.

a customer's account are located with the relevant customer defendants, all of whom are located outside of Montana and spread around the country.

Moreover, most cases against Snowflake are already deemed related and assigned to the Chief Judge of the District of Montana, and the Snowflake will file a motion today to consolidate them in a single proceeding—with the consent of many plaintiffs. Broome Decl. at ¶ 3. The Panel's "past decisions make clear that centralization under Section 1407 should be the last solution after considered review of all other options." *In re Comcast Corp.*, 190 F. Supp. 3d 1344, 1345 (J.P.M.L. 2016) (internal quotation marks and citations omitted) (denying motion for centralization). Such alternatives "include transfer pursuant to 28 U.S.C. § 1404, as well as voluntary cooperation and coordination among the parties and the involved courts to avoid duplicative discovery or inconsistent pretrial rulings." *Id.*; *see also In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*, 38 F. Supp. 3d 1380, 1381 (J.P.M.L. 2014) (denying motion for centralization) ("[I]nformal cooperation among the involved attorneys is both practicable and preferable to centralization."). What makes most sense here is to continue what many of the parties have already started pursuing: separate single-defendant consolidated proceedings.

C.  **Centralization is Not Efficient Here**

Centralization will not lead to more efficient pre-trial proceedings—on the contrary, it will expand and complicate what should be straightforward defendant-specific discovery into a morass that combines six separate streams of discovery of six entirely separate defendant entities (all with their own unique and separate defenses and factual issues, and unique damages considerations). *See in re Varsity Athlete Abuse Litig.*, 677 F. Supp. 3d 1376, 1378 (J.P.M.L. 2023) (denying centralization where "[d]iscovery regarding each individual defendant's conduct and their

relationship to and interactions with the common defendants will not overlap. Therefore, any efficiencies to be gained by centralization may be diminished by unique factual issues.").

Here, as mentioned above, discovery into Snowflake's customers will likely focus on the nature and content of the data that they chose to manage using Snowflake's platform and whether they took appropriate measures to secure that data given its degree of sensitivity. By contrast, discovery of Snowflake (which has limited visibility into its customers data and does not secure their access points for them) will focus on the varying contractual obligations that Snowflake has with its customer, the various communications that Snowflake had with each customer, and the security recommendations and security tools that Snowflake made available to its customers.

The Panel may be inclined to find that the number of defendants and districts involved in this litigation, along with the possibility of overlapping classes, weighs in favor of consolidation. But the opposite is true. To sweep all related cases into a single MDL, even cases where Snowflake is not a named defendant, will only serve to complicate and prolong pretrial issues, requiring complex motions practice, multiple discovery tracks, and a lengthy bellwether process. *See In re OSF Healthcare Sys. Emp. Ret. Income. Sec. Act (ERISA) Litig.*, 223 F. Supp. 3d 1343, 1344 (J.P.M.L. 2016) (denying centralization despite overlapping classes of plaintiffs because of small number of actions and coordination efforts among the parties). To the extent discovery does overlap across certain cases, the parties can easily achieve efficiencies by coordinating and sharing third-party discovery via stipulations as necessary.

In short, centralization is neither efficient nor necessary here.

## CONCLUSION

For the foregoing reasons, the Motion should be denied.

DATED: August 21, 2024

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By */s/ Stephen A. Broome*
Stephen A. Broome
Quinn Emanuel Urquhart & Sullivan LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
*stephenbroome@quinnemanuel.com*

Attorney for Snowflake